# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01998-NYW

JEFF COLDWELL, and
ISAAC MERTENS, individually and on behalf of all others similarly situated,

     Plaintiffs,

v.

RITECORP ENVIRONMENTAL PROPERTY SOLUTIONS,
a Colorado corporation, formerly d/b/a PESTRITE, and
ESG ACHIEVEMENT, INC., a Utah corporation,

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

     This matter comes before the court on Plaintiffs' Motion for Equitable Tolling of the Statute of Limitations ("Motion for Tolling") [#27, filed October 27, 2016] and Defendant ESG Achievement, Inc.'s Motion for Summary Judgment. [#32, filed December 29, 2016]. The Motions are before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c) and the Order of Reference dated September 16, 2016 [#15]. The court has carefully considered the Motions and related briefing, the entire case file, the applicable case law, and the comments offered by counsel during the April 27, 2017 Motion Hearing. For the following reasons, the court GRANTS the Motion for Summary Judgment and DENIES the Motion for Tolling.

## PROECEDURAL BACKGROUND

     Plaintiffs Jeff Coldwell and Isaac Mertens initiated this action on August 5, 2016, by filing a Complaint asserting a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), for unpaid overtime wages on behalf of themselves and all others similarly

situated. [#1]. Plaintiffs also assert a violation of the Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq.* On August 31, 2016, Defendant ESG Achievement, Inc. ("ESG") filed an Answer. [#11]. On September 28, 2016, Defendant Burns Family Investments & Holdings ("RiteCorp") filed an Answer. [#19]. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Plaintiffs are residents of Weld County, Colorado and allege that they are or were employed by ESG and RiteCorp (collectively, "Defendants") as pest controllers. [#1 at ¶¶ 1, 7-8]. On September 30, 2016, the court held the first of two Scheduling Conferences, and discussed with the Parties the utility of a phased discovery plan and pursuing summary judgment on the threshold issue of whether ESG qualifies as an "employer" of Plaintiffs. *See* [#21]. On October 17, 2016, the court held the second Scheduling Conference, at which the undersigned set certain pre-trial dates and deadlines for a three-phrase discovery process. *See* [#25, #26]. Specifically, during the first phase the court would determine whether ESG is a proper defendant; during the second phase the court would determine whether the action should be conditionally certified as a collective action; and the Parties would engage in merits and damages discovery during the third phase. [*Id.*] The Scheduling Order permits Plaintiffs to file a motion for conditional certification no earlier than April 4, 2017.

On October 27, 2016, Plaintiffs filed the Motion for Tolling, asking the court to toll the applicable statute of limitations from the date of the entry of the Scheduling Order until 90 days after potential opt-in plaintiffs receive notice of the lawsuit or the court denies the notice, on the basis that "potential opt-in plaintiffs are exposed to significant prejudice and risk their claims expiring during the early discovery phases." [#27 at 2]. On November 21, 2016, RiteCorp filed its Response [#28], in which ESG joins. *See* [#29]. Plaintiffs did not file a Reply.

On December 29, 2016, ESG filed the Motion for Summary Judgment, arguing that it cannot be liable under Plaintiffs' claims because it is not Plaintiffs' employer for the purposes of the FLSA. *See* [#32]. Plaintiffs filed a Response on January 19, 2017 [#33], and ESG filed a Reply on February 2, 2017. [#35]. This court held oral argument on the Motion on April 27, 2017. [#44].

## ANALYSIS

### I. Motion for Summary Judgment

#### A. Legal Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248–49. *See also Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). However, the nonmovant "may not rest upon mere allegation or denials of [the] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [its] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998). Ultimately, however, the court may not enter summary judgment unless Defendant carries its burden under Rule 56 of the Federal Rules of Civil Procedure. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002). *See also* Fed. R. Civ. P. 56(a).

## B. Undisputed Material Facts

The following facts are uncontroverted or viewed in the light most favorable to Plaintiffs as the nonmoving parties. RiteCorp operated a pest control and extermination business. In November 2005, RiteCorp executed a Subscriber Service Agreement with ESG ("Subscriber Agreement"). [#32 at 3, ¶ 2; #33 at 2-3, ¶ 2; *see also* #33-1]. ESG is a Professional Employer Organization ("PEO").[1] [#32 at 2, ¶ 1; #33 at 2, ¶ 1; *see also* #32-2; #32-11]. Under the Subscriber Agreement, ESG retained certain rights including:

---

[1] PEOs are created and governed by the Colorado Employment Security Act, Colo. Rev. Stat. § 8-70-101 *et seq.*, which the general assembly enacted in large part "for the compulsory setting

the right to hire, fire, and discipline employees, provide for the welfare and benefit of co-employees, assign coemployees to subscriber locations, set co-employees rates of pay, maintain employment records, provide unemployment compensation required as an employer, sponsor and administer workers compensation plans, health plans, employee benefit plans, and address co-employee's complaints, claims, or requests related to employment.

[#33 at 6; *see also* #33-1 at ¶ 5]. ESG has never operated a pest control business and does not know how to operate such a business. [#32 at 2, ¶ 2; #33 at 2, ¶ 2]. Rather, in its role as "administrative employer," pursuant to the Subscriber Agreement, ESG "handled payroll, managed and administered employment benefits such as health insurance and life insurance, managed workers compensation and unemployment insurance, managed workers compensation claims, remitted payroll taxes on behalf of its subscribers as ESG, and ensured that all relevant taxes were withheld as to the co-employees." [#32 at 2, ¶ 1; #33 at 9, ¶ 13]. ESG performed these functions on behalf of RiteCorp for a set fee. [#32 at 3, ¶ 6(e); #33 at 4, ¶ 6(e)].

The Subscriber Agreement specified that only ESG employees were "eligible for workers compensation insurance, benefits, terms and conditions of employments," and only ESG employees would receive a paycheck. [#33 at 7; *see also* #33-1 at ¶ 6(q)(i)-(iii)]. This eligibility was limited to employees who had completed ESG's "enrollment documents, including but not limited to, [ESG's] employment application, W-4 withholding form, and Form I-9," all of which ESG had to receive and acknowledge before the employee could begin working. [*Id.*]

ESG presented each new employee with an "Employer Solutions Group (and Its Entities) Employee Acknowledgement Form." [#33 at 7; *see also* #33-2]. The form provides that each employee is "a co-employee of ESG and [RiteCorp]," and requires that each employee "accept the conditions of the co-employment relationship between" him or her, ESG, and RiteCorp.

---

aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own." Colo. Rev. Stat. § 8-70-102.

[#33-2 at 1]. The form also requires the employee to abide by the terms and conditions of the ESG Employment Handbook and to contact ESG within 48 hours of termination so as to explore other employment opportunities. [#33-2 at 1-2]. The form also notified the employee that employment was at will, and ESG and/or RiteCorp could terminate the employment "at any time for any reason, with or without notice," and that ESG and/or RiteCorp could unilaterally change the employee's salary or wages "from time to time," at either's discretion. [*Id.*] ESG required all co-employees to abide by its drug and alcohol policy and consent to random drug testing, and ESG in fact subjected co-employees to random tests. [#33 at 9, ¶¶ 14, 15; #33-8; #33-9]. ESG also required that co-employees abide by its Sexual Harassment Policy, which stated in part that co-employees could report harassment to ESG. [#33 at 9, ¶ 16; #33-10]. ESG provided Affirmations of Legal Work Status to the State of Colorado, affirming, in its position as employer, the work status of new employees. *See* [#33-5].

ESG did not exercise daily control over Plaintiffs' work and did not supervise Plaintiffs' day-to-day activities. [#32 at 3, ¶¶ 6(a)-(b); #33 at 3, ¶¶ 6(a)-(b)]. Plaintiffs did not perform any jobs or services for ESG; rather, ESG could discharge its duties to its clients and other stakeholders regardless of whether Plaintiffs performed their jobs and regardless of whether RiteCorp remained ESG's client. [#32 at 4, ¶ 6(i); #33 at 5, ¶ 6(i)]. ESG made no investment in any equipment or facilities provided or available to Plaintiffs that enabled them to carry out their pest control duties. [#32 at 4, ¶ 6(j); #33 at 5, ¶ 6(j)]. ESG did not own, lease, or control any of the facilities in which Plaintiffs worked, or provide or maintain any equipment or facilities used by Plaintiffs. [#32 at 4, ¶ 6(k); #33 at 6, ¶ 6(k)]. RiteCorp terminated the Subscriber Agreement on December 27, 2014. [#32 at 3, ¶ 5; #33 at 3, ¶ 5].

## C.     FLSA

### 1.     _Applicable Law_

The FLSA governs the payment of minimum wages and overtime compensation between an employer and its employees. _See_ 29 U.S.C. §§ 206–207. Under the FLSA, a covered employer must pay its employees for the time that it employs them; and the FLSA generally requires covered employers to compensate employees for work in excess of forty hours in a workweek. _See_ 29 U.S.C. §§ 206(a), 207(a). The required overtime compensation is one and one-half times an employee's "regular rate" of pay. 29 U.S.C. § 207(e). The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" _Nationwide Mut. Ins. Co. v. Darden,_ 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)). Separate entities that share control over an individual worker may be deemed "joint employers" under the FLSA. _See_ 29 C.F.R. § 791.2(a). "If the facts establish that the employee is employed jointly by two or more employers…all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions…" _Id._ The relevant Department of Labor regulations list the following as examples of situations in which joint employment exists:

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees;
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

*Id.* at § 791.2(b) (footnotes omitted).[2]  The concepts of joint employment status are sometimes characterized as "horizontal" when "the employee has employment relationships with two or more employers and the employers are sufficiently associated or related with respect to the employee such that they jointly employ the employee," and "vertical" when "the employee has an employment relationship with one employer (typically a staffing agency, subcontractor, labor provider, or other intermediary employer) and the economic realities show that he or she is economically dependent on, and thus employed by, another entity involved in the work."  United States Department of Labor, Administrator's Interpretation 2016-1, <u>Joint employment under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act</u> (Jan. 20, 2016), https://www.dol.gov/whd/flsa/Joint_Employment_AI.htm.

Whether an entity is an employer within the meaning of the FLSA is a legal question, with subsidiary findings considered issues of fact.  *Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 WL 4512327, at *9 (D. Colo. July 27, 2015) (citing *Patel v. Wargo*, 803 F.2d 632, 634 (11th Cir. 1986)).  The Tenth Circuit has not yet articulated a test for determining whether two entities are joint employers under the FLSA.  *See Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1178 (N.D. Okla. 2006).  However, the Tenth Circuit has adopted the "economic realities" test in analogous situations to determine whether a particular defendant acted as an "employer" as defined by the FLSA.  *See Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998) (applying the economic realities test to determine whether

---

[2] Congress tasked the U.S. Department of Labor ("DOL") with interpreting the terms of the FLSA and issuing regulations thereunder.  *See generally* 29 U.S.C. § 204 (creating the DOL's Wage and Hour Division to administer the substantive provisions of the FLSA).  *See also Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1299 n.8 (11th Cir. 2011).  The court may defer to regulations such as these when the statutory language is ambiguous or the

plaintiffs were employees or independent contractors); *Henderson v. Inter–Chem Coal Co., Inc.,* 41 F.3d 567, 570 (10th Cir. 1994) (same). Additionally, district courts within the Tenth Circuit, including Colorado, have applied the economic realities test at both the motion to dismiss and summary judgment phase to consider whether two entities qualify as "joint employers." *See Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1079 & n.15 (D. Colo. 2016); *Sanchez v. Simply Right, Inc.*, No. 15–cv–00974–RM–MEH, 2017 WL 749071, at *8-10 (D. Colo. Feb. 27, 2017). *See also Harbert v. Healthcare Svcs. Group, Inc.*, 173 F. Supp. 2d 1101, 1105 (D. Colo. 2001) (applying the FLSA economic realities test in the FMLA context to conclude that fact question existed as to whether employee was jointly employed by housekeeping service and nursing home) (citing *Goldberg v. Whitaker,* 366 U.S. 28, 33 (1961)); *Zachary*, 471 F. Supp. 2d at 1179. The weight of this authority guides this court to apply the economic realities test to determine whether ESG is a joint employer for the purposes of the FLSA.

Under the economic realities test, "the inquiry is not limited to traditional common law concepts of employee…or contractual terminology." *Harbert*, 173 F. Supp. 2d at 1105 (quoting *Henderson,* 41 F.3d at 570) (internal quotations omitted). The factors that comprise the economic realities test change according to the circumstances of the inquiry. *See id.* ("the Court must simply 'focus upon the circumstances of the whole activity and the economic reality of the relationship.'") (quoting *Szymula v. Ash Grove Cement Co.,* 941 F. Supp. 1032, 1036 (D. Kan. 1996)). ESG and Plaintiffs propose slightly different factors for the court to consider. *Compare* [#32 at 8] *with* [#33 at 12]. While conceding that some of the factors do not fit neatly within a joint employer analysis, ESG asserts that this court's analysis should consider:

---

statutory terms are undefined. *Chevron U.S.A. Inc. v. Natural Res. Def. Council,* 467 U.S. 837,

> (1) the nature and degree of the putative employer's control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions; (4) the power to determine the workers' pay rates or methods of payment; (5) the preparation of payroll and payment of workers' wages; (6) the ownership of the facilities where the work occurred; (7) whether the worker performed a line job integral to the end product; and (8) the relative investment in equipment and facilities.

[#32 at 10 (citing *Jeanneret v. Aron's East Coast Towing, Inc.*, No. 01-8001-CIV, 2002 WL 32114470, at *3 (S.D. Fla. Jan. 29, 2002)]. *See also Baker*, 137 F.3d at 1440 (identifying the following factors as part of the economic realities test: "(1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business") (citing *Henderson,* 41 F.3d at 570); *Zachary*, 471 F. Supp. 2d at 1179 (observing that certain *Baker* factors, such as the worker's investment in the business and degree of skill and independent initiative required are more relevant for distinguishing independent contractors from employees and "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer").

Plaintiffs contend that the four factors articulated by the Ninth Circuit in *Bonnette Cal. Health & Welfare Agency*, 704 F.2d 1465 (9th Cir. 1983), should guide the court in its economic realities assessment. The *Bonnette* court asked whether "the alleged employer has the power to hire and fire employees," "supervises and controls employee work schedules or conditions of employment," "determines the rate and method of payment," and "maintains employment records." *Id.* at 1470.

---

843–45 (1984).

In applying the economic realities test to the motions under consideration, courts in this District have taken different approaches. The *Beltran* court considered the *Baker* and *Bonnette* factors altogether. *See Beltran*, 176 F. Supp. 3d at 1079 & n.15. By comparison, the *Sanchez* court acknowledged that the *Baker* factors may or may not be applicable to the joint employer analysis, and instead chose to consider "any factors that reasonably apply to the circumstances presented," with the aim of employing a "totality-of-the-circumstances approach." *Sanchez*, 2017 WL 749071, at *8-10 (citing *Baker*, 137 F.3d at 1440–41). Regardless of the particular factors considered, the inquiry must take into account the totality of the circumstances and the worker's economic dependence, or lack thereof, on the purported employer. *See* 29 C.F.R. § 791.2(a) ("A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case."); *Baker*, 137 F.3d at 1440 (holding that an individual's economic dependence is a "focal point" of the economic realities test). Also important, although not dispositive, is the degree of control the purported employer exercises over the worker. *See, e.g., Harbert*, 173 F. Supp. 2d at 1106 ("The inquiry should focus on whether an employer 'possesse[s] sufficient indicia of control to be an employer' under the Act") (quoting *Boire v. Greyhound Corp.,* 376 U.S. 473, 481 (1964)); *Rios v. Midwest Partitions, Inc.*, No. 15–cv–01456–PAB–MEH, 2016 WL 7212480, at *4 (D. Colo. Dec. 13, 2016) ("courts consider the extent of control exercised by the various employers, but the precise balance of factors depends on the facts of each case"); *Harris v. Universal Contracting, LLC*, No. 2:13–CV–00253 DS, 2014 WL 2639363, at 5 (D. Utah Jun. 12, 2014) ("the level of control an organization or individual has over the employees is central in determining employer status."); *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1161 (11th Cir. 2008) (holding that

"unexercised authority is insufficient to establish liability as an employer"). *But see Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir. 1999) (holding control may be exercised "only occasionally, without removing the employment relationship from the protections of the FLSA"); *Donovan v. Janitorial Services, Inc.,* 672 F.2d 528, 531 (5th Cir. 1982) (holding that an owner's mere occasional exercise of authority did not "diminish the significance of its existence"). This court is also cognizant that, in assessing the relationship, the definition of employer is "expansive." *See, e.g., Falk v. Brennan,* 414 U.S. 190, 195 (1973). But the focus of the analysis is on the employee, and not the legal relationship between the employers. *See Harbert*, 173 F. Supp. 2d at 1106. With this framework in mind, the court turns to the Parties' arguments regarding the relationship between ESG and Plaintiffs.[3]

2. *Review of Factors* [4]

**Control.**     ESG first argues that it did not exercise any control over Plaintiffs. [#32 at 10-11]. The Vice President of ESG, Meribeth Lunn, attests that during ESG's contractual relationship with RiteCorp, it played no role in assigning Plaintiffs to any particular jobs, setting Plaintiffs' schedules, supervising Plaintiffs' work, or determining their duties. [#32-

---

[3] No one disputes that ESG is an employing unit as defined in Colo. Rev. Stat. § 8-70-114(1). Section 8–70–114(1) defines an employing unit for purposes of determining benefits for those working in Colorado. *Dewhurt v. Industrial Claim Appeals Office of State of Colorado*, 148 P.3d 378, 380 (Colo. App. 2006). The statute distinguishes between "employing unit" and "employer." *See generally* Colo. Rev. Stat. § 8-70-114; *see also* Colo. Rev. Stat. § 8-70-113. "An 'employing unit' is an extremely broad term used to describe virtually any individual or organization that employs anyone in the state." *Colo. Div. of Employment and Training v. Accord Human Resources, Inc.*, 270 P.3d 985, 989 (Colo. 2012) (citing § 8–70–114(1)). "'Employers' are a subset of 'employing units' that meet additional qualifications, such as paying a certain amount of wages." *Id.* (citing § 8–70–113(1)(a)(II)). However, section 8-70-114(1) addresses only how individuals should be treated for benefit purposes; there is no indication that the definitions in this statute or in section 8-70-113 control for the purpose of allocating liability for unpaid wages under the FLSA or CWCA.

[4] The factors included here comprise a combination of *Bonnette* and *Baker* factors and are the factors that the Parties' briefed.

1 at ¶ 5]. The President of ESG, Steven Pierson, testified that, "[w]e don't know their business…we don't know their employees." [#32-5 at 25:6-16]. Plaintiff Coldwell testified during his deposition that he did not "know the full scope of [ESG's] work," and knew that "they handled payroll and that kind of thing." [#32-3 at 20:10-15]. He also testified that he never worked with anyone from ESG during the course of his employment with RiteCorp and no one from ESG was involved in setting his schedule. [*Id.* at 20:16-21:3]. Plaintiff Mertens testified that he understood ESG was RiteCorp's payroll company. [#32-4 at 18:20-23]. He testified that he never worked with anyone from ESG during his employment with RiteCorp, and no one from ESG gave him a work schedule or modified his work schedule. [*Id.* at 18:24-19:11]. Plaintiff Coldwell testified that he received his schedule from Dan Bolen, a RiteCorp manager, who served as his point of contact when necessary. [#32-3 at 12:4-6, 16:13-24]. Plaintiff Mertens similarly testified that he received his work schedule from the "RiteCorp general office." [#32-4 at 12:6-7]. Plaintiffs testified that RiteCorp employees, not ESG employees, trained them in their job duties. *See* [#32-3 at 9:8-10; 10:15-23; 11:5-18; #32-4 at 10:19-22].

    ***Oversight and/or Supervision of Work.***  Ms. Lunn attests that ESG did not oversee or supervise Plaintiffs' work. [#32-1 at ¶ 5(a)]. Plaintiff Coldwell similarly testified that no one from ESG gave him direction as to how to perform his job or otherwise supervised him; and no one from ESG was involved in setting his schedule. [#32-3 at 20:16-21:3]. He testified rather that RiteCorp employee Brandon Ewals-Strain supervised him. [*Id.* at 10:11-16]. Plaintiff Mertens testified that no one from ESG gave him direction on how to perform his job and no one from ESG supervised his work. [#32-4 at 18:24-19:11]. He testified that Mr. Bolen conducted his initial interview, offered him the pest controller position, completed his evaluations, and led periodic training meetings. [*Id.* at 9:6-8; 9:17-25; 10:1-4; 11:16-23]. Plaintiff Mertens also

testified that Mr. Ewals-Strain trained him and helped him with larger projects. [*Id.* at 9:25-10:18]. Plaintiffs allege in their Complaint that RiteCorp "retained day-to-day operational control over the employees, including scheduling, training, work assignments and collection of hours." [#1 at ¶ 16].

   ***Hiring and Termination Decisions.*** Plaintiff Coldwell testified that ESG was not involved in his performance reviews or evaluations. [#32-3 at 22:16-19]. Plaintiff Mertens testified that no one at ESG disciplined him, and that he was unaware of "any situation where ESG made decisions regarding the employees that were hired to work at RiteCorp." [#32-4 at 19:23-24, 20:14-17]. Mr. Pierson testified that the acknowledgement form that ESG requires new employees to sign serves simply to "help the co-employees understand that [ESG] will in no way impact their relationship with the company that hired them," and that they continue to be employed by the hiring company with the same rate of pay, working conditions, work location, and duties. [#32-5 at 9:14-15, 15:5-13].

   ***Payment of Wages.*** Ms. Lunn attests that RiteCorp retained exclusive authority to set Plaintiffs' pay rates and methods of payment. [#32-1 at ¶ 5(d)]. Mr. Pierson testified that ESG relies on its clients to provide information regarding compensation for its employees. [#32-5 at 57:15-18]. He also testified that while the Subscriber Agreement contained language suggesting that ESG would retain some discretion to change salary or wages for co-employees, ESG "in practice" never did that; rather, he testified that "[i]f we attempted to do things like that for our clients, we wouldn't have very many clients." [*Id.* at 25:6-16]. Plaintiffs testified that they did not know whether ESG was involved in determining the compensation for RiteCorp employees. [#32-3 at 22:1-11; #32-4 at 20:6-13].

***Employment Records and Payroll.***   Ms. Lunn testified during her deposition that ESG maintains information regarding each co-employee's payroll deductions, benefit deductions, personal information, pay registers, and voucher registers.   [#33-7 at 89:10-90:22]. Ms. Lunn also attests that ESG made wage payments to Plaintiffs during the term of the Subscriber Agreement and also paid workers compensation insurance premiums and handled other aspects of payroll related to taxation.   [#32-1 at ¶ 5(e)].   She also attests that, these responsibilities notwithstanding, RiteCorp controlled the payment of wages.   [*Id.* at ¶ 5(f)]; *see also* [#32-5 at 21:2-3].   RiteCorp provided the number of hours that its employees worked, and had primary responsibility for addressing any discrepancies reported by employees regarding their pay.   [#32-1 at ¶ 5(f),(g)]; *see also* [#32-5 at 40:6-11, 42:3-6].   Ms. Lunn also attests that the wages ESG paid to RiteCorp employees came from payroll funds that RiteCorp remitted to ESG in advance, and that without the direction, hour reports, and advance payment of payroll funds, ESG could not process the payroll for RiteCorp employees.   [#32-1 at ¶ 5(h)].

***Control of Equipment and Facilities.***       Ms. Lunn attests that ESG did not provide any facilities, equipment, tools, or inventory to RiteCorp's employees, and did not own, lease, or control any of the facilities in which Plaintiffs worked.   [#32-1 at ¶ 5(j), (k)].   Plaintiffs' testimony corroborated this.   Plaintiff Coldwell testified that no one from ESG exercised control over the facilities he used or the tools and equipment he required to perform his duties, and no one from ESG was involved in the servicing or maintenance of his work vehicle.   [#32-3 at 21:4-11].   Plaintiff Mertens testified that no one at ESG was involved in the equipment or supplies he used or in the maintenance or servicing of his work vehicle.   [#32-4 at 19:12-17].

3. *Findings*

At the outset, this court notes that there is no genuine dispute of material fact at issue in the Motion for Summary Judgment. Rather, the disagreement appears to be in how the law is applied to the stipulated facts. In applying the economic realities test (and the factors relevant to the joint employer inquiry) to the undisputed facts in the record, this court concludes that, notwithstanding the broad remedial nature of the statute, ESG is not Plaintiffs' co-employer for the purposes of the FLSA.

In assessing the economic realities of Plaintiffs' relationship with ESG, this court focuses on the relationship between Plaintiffs and ESG, and specifically the extent to which Plaintiffs were financially dependent on ESG and the extent to which ESG exercised control over them. *See Harbert*, 173 F. Supp. 2d at 1106; US Department of Labor, Administrator's Interpretation 2016-1, *supra*. The undisputed facts demonstrate that RiteCorp is the entity that provided for Plaintiffs' work schedules and salaries and instructed ESG as to how Plaintiffs should be compensated. ESG knew nothing about running RiteCorp's business and could not process RiteCorp's payroll unless RiteCorp remitted the necessary funds in advance. Unlike other entities (for instance, certain temporary agencies), ESG did not "loan" or "assign" Plaintiffs to RiteCorp, with the understanding that ESG could later reassign Plaintiffs to another client. Nor were Plaintiffs performing for RiteCorp the type of duties that ESG provides, such as bookkeeping or human resources services. Rather, as Plaintiff Coldwell testified, ESG was RiteCorp's payroll company. [#32-4 at 18:20-23]. There is insufficient evidence that Plaintiffs were economically dependent on ESG. Additionally, the record fails to demonstrate that RiteCorp exercised actual control over Plaintiffs. This court finds that the sole example of ESG

enforcing random drug testing at RiteCorp is insufficient to create a genuine issue of material fact as to joint employment.

Plaintiffs rely almost entirely on the language of the Subscriber Agreement to demonstrate that ESG was a joint employer if not in practice then in theory. For instance, Plaintiffs assert that the Subscriber Agreement gave ESG the authority to hire and fire its co-employees. *See* [#33-2 at ¶¶ 2, 3, 6, 10, 11, 12]. Under the Subscriber Agreement, ESG could control some conditions of Plaintiffs' employment, such as requiring them to adhere to its Drug and Alcohol Policy, submit to random drug tests, and become "employees" on its payroll. *See* [#33-1 at ¶ 6(q)(i)-(iii); #33-8; #33-9]. ESG was the "administrative employer" for the co-employees that it shared with RiteCorp, and was responsible for processing pay roll, withholding wages for tax purposes, and administering employment benefits. [#33-6 at 14:10-15:4, 51:12-52:5, 54:3-24; #33-7 at 33:23-35:6]. Additionally, under the Subscriber Agreement, ESG maintained Plaintiffs' employee records regarding tax information, results of drug testing pursuant to its policy, and verification of each co-employee's legal work status. [#33-1 at ¶ 5(i); #33-5]. Plaintiffs argue that ESG cannot stand in the position of co-employer for certain functions, like worker compensation and payroll taxes, and "then ask the Court to ignore the relationship for the purpose of ensuring that its co-employees are properly compensated." [#33 at 16].

Respectfully, this court finds that ESG's status as a PEO under Colorado law does not, without more, transform it into a co-employer under the FLSA for these Plaintiffs or RiteCorp's pest controllers in general. There is no indication that the definitions in Colo. Rev. Stat. § 8-70-114(1), regarding "coemployer" and "coemployment unit," and section 8-70-113, regarding "employers," control for the purpose of allocating liability for unpaid wages under the FLSA.

Nor is the court aware of any case law in Colorado or from this District opining otherwise. Indeed, such a position would seem incongruous with the directive that courts afford deference to the definitions that Congress devises for the laws it passes, in this case "employer" and "employ" as defined by the FSLA. *See* 29 U.S.C. §§ 203(d),(g). *See also* Colo. Rev. Stat. § 8-90-108 (discussing conformity with federal statutes). In short, this court does not find support within Colorado statutory or common law that an entity that satisfies the definition of employer or employing unit as defined by the Colorado Employment Security Act necessarily satisfies the definition of employer under the FLSA.

Plaintiffs do not point the court to any authority that holds otherwise. In *Tullous v. Texas Aquaculture Processing Co. LLC*, 579 F. Supp. 2d 811 (S.D. Tex. 2008), the case Plaintiffs predominantly rely on, the court found that disputed issues of fact regarding the joint employer question precluded summary judgment for defendant. Significantly, the employer and the staff leasing agency disputed which entity was responsible for compliance with FLSA requirements, and the employer contended that it had hired the staff leasing agency specifically to determine whether employees "were exempt or not exempt under the [FLSA]," and that it was the staff leasing agency's decision to classify the employees as exempt. *Id.* at 814-15. The *Tullous* court found that this disputed fact implicated all of the *Bonnette* factors along with the question of whether the staff leasing agency's "role may have been more than merely ministerial or administrative," and thus concluded there was a genuine dispute of material fact as to the economic realty surrounding plaintiffs' relationship with the staff leasing agency. *Id.* at 820. In other words, the *Tullous* court similarly applied the economic realities test and did not accept that the staff leasing agency was a joint employer simply because it had entered into a subscriber or similar agreement with the client. Here, there is no indication that ESG and RiteCorp dispute

that RiteCorp retained responsibility, either under the Subscriber Agreement or in practice, for complying with the FLSA. *See* [#32 at 2-3, ¶ 3; #32-2 at ¶ 6(a)]. And while Plaintiffs dispute this allocation of responsibility, *see* [#33 at 3, ¶ 3], there is no evidence in the record that ESG assumed responsibility in practice.

Further, the case law cited by Plaintiffs instructs the court that the question is not just who *could* exercise control, but who *actually* exercises control. *See Zachary*, 471 F. Supp. 2d at 1180 (observing that the record included "specific evidence" that the purported employer "made or assisted in making all FLSA decisions that are at issue," and declining to accept defendants' argument that the terms of their written agreement, which vested the right to control employment decisions in only one entity, should control for FLSA liability) (citing *Rios v. Airborne Express Inc.,* No. C–05–2092, 2006 WL 2067847, at *3 (N.D. Cal. July 24, 2006) (finding that defendant was not a joint employer as a matter of law where putative employer's contract with other employer stated that other employer exercised independent control over its employees *and there was no evidence in the record that the putative employer controlled or supervised plaintiffs* ) (emphasis added by *Zachary*); *Zavala v. Wal–Mart Stores, Inc.,* 393 F. Supp. 2d 295, 330 n.27 (D.N.J. 2005) ("In any event, the Contract would not resolve necessarily the question of whether Wal–Mart is an employer or joint employer of Plaintiffs. Contract disclaimers, which provide that a particular entity is/is not an employer or is/is not an independent contractor or employee, generally do not decide the issue.").[5] Evidence that the alleged employer retains the power to

---

[5] Plaintiffs cite *Peterson v. Trailways, Inc.*, 555 F. Supp. 827 (D. Colo. 1983) as instructive, and assert "there is no Colorado or 10th Circuit authority that supports the proposition that the 'economic realities' of a given situation supersede the existence of a valid contractual relationship." [#33 at 17]. However, *Peterson* dealt with an employee's right to sue his employer's parent in tort, outside of the agreement providing for worker compensation benefits that he had entered into with his employer. In finding that the parties' contractual agreement, and lack thereof between plaintiff and employer's parent, governed over the "economic realities"

hire and fire employees is probative, even if the entity does not exercise its authority, *see Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 70 (2d Cir. 2003); however, the court then must ask who *supervises* and *controls* employee work schedules or conditions of employment, who *determines* the rate and method of payment, and who *maintains* employment records. These are verbs and denote action, and thus the language framing the *Bonnette* factors corroborates the *Harbert* guidance that the purported employer must possess "sufficient indicia of control," to qualify as an employer. *Harbert*, 173 F. Supp. 2d 1101, 1106. *See also Zachary*, 471 F. Supp. 2d at 1180 (finding as material that defendant "not only had the authority to exercise control over employment decisions but *did* exercise this control…") (emphasis in original); *Sikiotis v. Vitesse Worldwide Chaufeeured Services, Inc.*, 147 F. Supp. 3d 39, 47 (D. Conn. 2015) (finding plaintiff who had sued employer company and individual supervisor for FLSA violations stated a claim against supervisor by alleging not just that supervisor had authority to carry out certain tasks, but that "he exercised this authority," and observing that "[t]o what extent and with what frequency [he] exercised his authority requires a more developed factual record").

Ultimately, the Subscriber Agreement represents a written exchange of rights and responsibilities as required by statute to allow one company to administer payroll services and participate in employment benefit plans on behalf of another company. Such a relationship could certainly give rise to a joint employer scenario as defined by the FLSA. However, this court does not find that there is sufficient evidence to submit this issue to a jury, primarily

---

of their relationship, the *Peterson* court considered that the essence of "[c]ompensation law" is the agreement between the employee and employer by which each "give up and gain certain things," and "[t]o thrust upon a worker an employee status to which he has never consented… might well deprive him of valuable rights under the compensation act, notably the right to sue his own employer for common-law damages." *Peterson*, 555 F. Supp. at 832 (citation omitted). *Peterson* also included in its analysis the "well established principles of corporation law," that

because the evidence shows that Plaintiffs were not economically dependent on ESG and ESG did not actually exercise its rights under the Subscriber Agreement. *See Jeanneret*, 2002 WL 32114470, at \*4 (stating, in similar context of whether an employee leasing company is a joint employer based on subscriber service agreement, that "[t]he provisions of a state law regulating the employment relationship are only relevant to the extent that the parties actually followed those requirements."). *See also Vondriska v. Paycheex Business Solutions, Inc.*, 8:07–CV–1322–T–24–TGW, 2009 WL 632889, at \*7-9, 16-17 (M.D. Fla. Mar. 11, 2010) (adopting rationale set forth in *Jeanneret* and distinguishing *Tullous*) *judgment vacated on different grounds by Vondriska v. Cugno*, 368 F. App'x 7 (11th Cir. 2010). *Cf. Zachary*, 471 F. Supp. 2d at 1183 (concluding that the written agreement, "which formed the primary basis of [defendant's] motion for summary judgment, is not controlling or persuasive in light of other evidence in the record that supports a finding of joint employment").

Just as the Tenth Circuit has said it will not limit its inquiry into whether an individual is covered by the FLSA, "by any contractual terminology or by traditional common law concepts of 'employee' or 'independent contractor,'" *Baker*, 137 F.3d at 1440, this court will not rely solely on contractual language to accept that ESG is Plaintiffs' employer. In so deciding, this court has read the FLSA and the terms "employ" and "employer," expansively, and in no way concludes that a PEO, or even ESG, would never qualify as a joint employer under the FLSA. However, a scenario in which a PEO would qualify as a joint employer would necessarily include facts of economic dependence and control that are not present here. Viewing the undisputed facts in a light most favorable to Plaintiffs, this court respectfully finds that Plaintiffs

---

"refuse[] to allow a parent corporation the benefits of employer's immunity when sued in tort by an employee of its subsidiary." *Id.* (citations omitted).

have not carried their burden of demonstrating that a material issue of fact exists regarding ESG's employer status.

### D. Colorado Wage Claim Act

The Colorado Wage Claim Act ("CWCA"), Colo. Rev. Stat. § 8-4-101 *et seq.*, allows an employee "to sue his or her former employer for earned wages and other compensation the employer has refused to pay." *Lester v. Career Bldg. Acad.*, 338 P.3d 1054, 1058 (Colo. App. 2014). *See also* Colo. Rev. Stat. § 8-4-109. The CWCA defines "employer" as "every person, firm, partnership, association, corporation, migratory field labor contractor or crew leader, receiver, or other officer of court in Colorado, and any agent or officer thereof, of the above mentioned classes, employing any person in Colorado." Colo. Rev. Stat. § 8-4-101(6).

This court was unable to find a decision in which a Colorado court has applied a joint employment test to a CWCA claim, and, consistent with the reasoning above, this court does not assume that ESG is not an employer under the CWCA simply because it is not an employer under the FLSA. In *Solis v. The Circle Group, LLC*, a court in this District concluded that the Colorado Supreme Court would likely recognize a CWCA claim against a joint employer. No. 16-cv-01329-RBJ, 2017 WL 1246487, at *4 (D. Colo. Apr. 5, 2017). In so finding, the *Solis* court observed that the CWCA, "[o]n its face…focuses on the real-world relationship between a worker and a firm, covering situations in which an employee works 'for the benefit of an employer' so long as the employer has sufficient control over the employee." *Id.* In assuming that a CWCA claim against a joint employer is viable, this court finds that an employer's control over the employee is a necessary element for satisfying the CWCA definition of employer.[6] Accordingly, for the reasons stated above, this court concludes that ESG fails to exercise the

requisite control over Plaintiffs to be an employer for the purposes of the CWCA.[7]

## II.    Motion for Tolling

Plaintiffs seek equitable tolling of the statute of limitations applicable to the claims of "potential opt-in plaintiffs," whom plaintiffs assert "are exposed to significant prejudice and risk their claims expiring during the early discovery phases."  [#27 at 2].  Plaintiffs ask that the court equitably toll the statute of limitations from the date of entry of the Scheduling Order, October 17, 2016, until ninety days "after the opt-in plaintiffs receive notice of this lawsuit or the Court issues an order denying the provisions of such notice."  [*Id.*]  Defendant RiteCorp responds essentially that Plaintiffs have not demonstrated the extraordinary circumstances necessary to support application of the equitable doctrine of tolling.  *See* [#28].  At this juncture, this court agrees that equitable tolling is not warranted.

### A.    Applicable Law

A claim accrues under the FLSA when the employer fails to pay the required compensation.  29 U.S.C. § 255.  The employee must then commence the action within two years of accrual, or within three years if the cause of action arises out of a willful violation, or the cause of action is barred.  *Id.* at § 255(a).  An action is "commenced" on the date the complaint is filed, subject to certain exceptions.  *Id.* at § 256.  In a collective action, an individual claimant whose name does not appear on the initial complaint commences an action when he or she files written consent.  29 U.S.C. § 256(b).

---

[6] Both ESG and Plaintiffs contemplate that the court's analysis regarding the joint employer question would apply to the CWCA question.  *See* [#32 at 19; #33 at 19].

[7] At oral argument, ESG argued that Plaintiffs' CWCA claim would also fail as a matter of law because any right to the wages claimed by Plaintiffs arose under the FLSA and not under the terms of their employment contract, which did not include a provision for overtime.  This court declines to address this argument which was raised for the first time on Reply.  *Compare* [#32 at

Equitable tolling is a general principal that courts may apply to toll the expiration of the statute of limitations when circumstances warrant. *See, e.g., Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1181 (D. Colo. 2012) (stating the doctrine of equitable tolling "permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity.") (citations omitted). Courts in their discretion may apply the doctrine to claims arising under federal statutes, including the FLSA. *Id.* (citations omitted). Pursuant to Tenth Circuit guidance, courts should apply the tolling doctrine "when the defendant's conduct rises to the level of active deception, where a plaintiff has been lulled into inaction by a defendant, and 'likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights.'" *U.S. v. Clymore*, 245 F.3d 1195, 1199 (10th Cir. 2001) (quoting *Biester v. Midwest Health Servs., Inc,* 77 F.3d 1264, 1267 (10th Cir. 1996)). Application of the doctrine may also be appropriate if the plaintiff can show that "extraordinary circumstances" made it "impossible" to file a timely lawsuit. *Id.* Courts should apply the doctrine sparingly. *Stransky*, 868 F. Supp. 2d at 1181 (citing *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96 (1990); *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 560 (6th Cir. 2000)).

### B.    Application

FLSA collective actions are typically punctuated by a delay between the filing of the complaint and the court's conditional certification of the case as a collective action. *See Geiger v. Z-Ultimate Self Defense Studios LLC*, No. 14–cv–00240–REB–NYW, 2015 WL 1139843, at *3 (D. Colo. Mar. 11, 2015). Many courts have determined that the occurrence of this delay, on its own, is not sufficient to warrant equitable tolling of the statute of limitations because it does

19] with [#35 at 10]. *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011)

not demonstrate "that any plaintiff or any potential opt-in plaintiff was deceived, misled, lulled into inaction, or otherwise faced extraordinary circumstances that made it impossible for them to file a timely FLSA claim." *See, e.g., id.* Without a specific showing that potential plaintiffs have been misled or lulled into inaction, they are "presumed to be aware of the facts and circumstances of their employment, and it is those facts and circumstances that allegedly form the basis of the FLSA claims of the plaintiffs." *Id.* In *Stransky*, the court identified five factors to aid in the assessment of whether equitable tolling is appropriate: "(1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement." 868 F. Supp. 2d at 1181 (citing *In re Bank of America Wage and Hour Emp't Litig.*, No. 10–MDL–2138, 2010 WL 4180530 (D. Kan. Oct. 20, 2010)).

Plaintiffs assert that they diligently attempted "to locate and speak with potential opt-in plaintiffs that may qualify for the proposed collective action," but contend that, their diligence notwithstanding, "potential opt-in plaintiffs do not currently have any mechanism to inform the Court of their desire to opt-in or otherwise commence their cause of action outside of filing a completely separate case on their own." [#27 at 5]. Plaintiffs also contend that equitable tolling will work no prejudice on RiteCorp because it has been on notice since the beginning of this lawsuit that Plaintiffs are pursuing a collective action. *Id.* Plaintiffs do not otherwise address the factors listed in *Stransky*. Perhaps of more significance, Plaintiffs provide no reason to support the propriety of equitable tolling other than possible prejudice associated with the delay between the filing of the complaint and the conditional certification of the action, which most FLSA

---

(arguments raised for the first time in a reply brief generally are deemed waived).

plaintiffs experience. Indeed, Plaintiffs did not reply to Defendants' Response, in which Defendants specifically question the absence of extraordinary circumstances or wrongdoing and contend that tolling of the statute of limitations will cause them prejudice "by the unnecessary delay, the uncertain period of potential exposure, and being forced to defend stale claims." [#28 at 9]. Accordingly, this court finds that equitable tolling is not appropriate at this time. However, Plaintiffs may renew their request if at a later time they find evidence to support the application of equitable tolling.

### CONCLUSION

For the forgoing reasons, **IT IS ORDERED** that:

(1)     ESG Achievement, Inc.'s Motion for Summary Judgment [#32] is **GRANTED**;

(2)     The Clerk of the Court is **DIRECTED** to **ENTER** judgment on behalf of ESG Achievement, Inc. and against Plaintiffs;

(3)     ESG Achievement, Inc. is hereby **DISMISSED**, with Plaintiffs and ESG each bearing their own costs;[8] and

(4)     Plaintiffs' Motion for Equitable Tolling of the Statute of Limitations [#27] is **DENIED** without prejudice.

---

[8] While costs should generally "be allowed to the prevailing party," Fed. R. Civ. P. 54(d)(1), the district court may in its discretion decline to award costs where a "valid reason" exists for the decision. *See, e.g., In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, (10th Cir. 2009) (citations omitted). In recognizing the novelty of the question in this state of whether ESG in its role as a PEO is a joint employer, this court declines to impose costs.

DATED:  May 4, 2017                    BY THE COURT:


                                       s/ Nina Y. Wang
                                       United States Magistrate Judge